IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SUSAN K.,

        **Plaintiff,**

  v.                              Civil Action 2:22-cv-3806
                                    Judge Sarah D. Morrison
                                    Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Susan K., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 12) and **AFFIRM** the Commissioner's decision.

**I.    BACKGROUND**

On January 17, 2020, Plaintiff protectively applied for DIB, alleging disability beginning June 1, 2019, due to rheumatoid arthritis, white matter disease, IBS, migraines, asthma, and large parapsoriasis. (R. at 179–85, 219). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing. (R. at 43–75). Ultimately, the ALJ denied Plaintiff's application in a written decision on June 22, 2021. (R. at 8–24). When the Appeals Council denied Plaintiff's request for review, that denial became the Commissioner's final decision. (R. at 1–7).

Next, Plaintiff brought this action. (Doc. 1). As required, the Commissioner filed the administrative record (Doc. 9), and the parties briefed the issues (Docs. 12, 14, 15). The matter is ripe for review.

### A. Relevant Hearing Testimony

The ALJ summarized Plaintiff's hearing testimony as follows:

> At the hearing, [Plaintiff] testified that she is unable to work due to her impairments, particularly her rheumatoid arthritis with pain complaints. She testified that she lives with her husband. She has two years of college but no degree. [Plaintiff] further indicated that she is unable to write with a pen or pencil for an extended period before feeling pain. (Hearing testimony).

(R. at 16).

### B. Relevant Medical Evidence

The ALJ also discussed Plaintiff's medical records and symptoms related to her impairments as follows:

> Turning to the medical evidence, a CT of [Plaintiff]'s head taken on February 28, 2018 was abnormal with mild CVA. Acute CVA resolved. (Ex. 1F-16-18). [Plaintiff] had tingling and numbness in her right hand with two to three episodes the prior couple of days, which was a suspected stroke. An MRI of her brain showed mild changed, with the Doppler indicating mild to moderate bilateral proximal internal plaque with stenosis. (Ex. 1F-20, 30).
>
> Records from Clinton Neurological Services in July 2019 indicated reports of pain, but she reported feeling fine, with no fatigue. However, she had arthralgias/joint pain, joint swelling, joint stiffness, and muscle aches. She had no chest pain, no shortness of breath with exertion, and no shortness of breath when lying down. Her rheumatoid arthritis medications were refilled and adjusted at that time. (Ex. 13F-98, 99).
>
> [Plaintiff] visited East Clinton Family Practice from June 2018 through April 2020. She was assessed with rheumatoid arthritis. Her pain control was adequate. However, she reported ongoing fatigue. (Ex. 2F-2, 5, 116, 20, 23, 27, 39, 58).
>
> [Plaintiff] returned to East Family Practice from April to June 2020. On examination, she was assessed with rheumatoid arthritis with tenderness, limited range of motion. X-rays of her left and right foot taken the following month showed only mild changes. There was mild to moderate degenerative disc disease in the

> cervical and lumbar spine. (Exs. 3F-5, 9, 4F-2). [Plaintiff]'s rheumatoid arthritis reportedly worsened with more rheumatoid arthritis flares and debility. (Ex. 5F-5, 9). [Plaintiff] underwent physical therapy in June and July 2020 for her rheumatoid arthritis. (Ex. 12F).
>
> Consultative medical examiner, Phillip Swedberg, M.D., examined [Plaintiff] on August 7, 2020. Dr. Swedberg noted [Plaintiff]'s complaints of stroke-like symptoms in February 2019. Her visual acuity without corrective lenses was 20/200 on the right and 20/30 on the left. She was able to read large print on the right and small print on the left. The overall examination findings were within normal limits. (Ex. 6F).
>
> [Plaintiff] returned to East Clinton Family Practice from August to October 2020. An examination revealed tenderness and limited range of motion, but did not indicate any further detail. [Plaintiff] was assessed with moderate severity of pain, stiffness, numbness, and tingling, with episodes of multiple joint pains and exacerbations. Her rheumatoid arthritis pain control was stable. There was myalgia myositis at multiple sits. She was referred to neurology for possible MS evaluation. (Ex. 7F).
>
> [Plaintiff] also returned to Clinton Memorial Hospital from February 2019 through March 2021. An x-ray of [Plaintiff]'s left foot showed mild degenerative arthrosis of the first interphalangeal joint, small plantar calcaneal bone spur. An x-ray of her left and right hand was negative. An x-ray of her pelvis and hips showed tiny enthesophytes. As previously noted, an x[-]ray of her cervical spine showed mild to moderate degenerative changes, straightening of the cervical lordosis, and mild endplate spurring of the lumbar spine (on x-ray). (Ex. 9F).
>
> Rodel Cacas, M.D., treated [Plaintiff] from July 2019 through April 2021. Dr. Cacas noted [Plaintiff]'s wheezes, rales, and crackles. She had tenderness and limited range of motion, but a normal gait and station. Chronic pain syndrome, fatigue and monoclonal gammopathy was noted; however, her main problem was rheumatoid arthritis. She was doing better with medications, but continued to have pain and fatigue. A Romberg's test was abnormal. There was decreased pinprick in the lower left and right lower extremities with decreased vibration in the lower extremity. An EMG was normal. [Plaintiff] continued to have fatigue throughout treatment sessions in 2020 and 2021. She also developed Covid-19, but was stable, with some slight difficulties breathing. An acute asthma exacerbation was indicated with infection of sebaceous cyst, and skin sensation disturbance, as well as plaque psoriasis. However, her main problem remained rheumatoid arthritis, with continued flares and exacerbations. (Exs. 10F, 11F).

(R. at 16–17).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirements through December 31, 2021, and has not engaged in substantial gainful activity since June 1, 2019, the alleged onset date. (R. at 14). The ALJ determined that Plaintiff has the severe impairment of rheumatoid arthritis. (*Id.*). Still, the ALJ found that Plaintiff's impairment does not meet or medically equal a listed impairment. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ concluded:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except [Plaintiff] cannot climb ladders, ropes, and scaffolds. She can frequently climb ramps and stairs. [Plaintiff] can also frequently perform stooping, kneeling, crouching, and crawling.

(R. at 15).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (R. at 17).

Relying on the vocational expert's testimony, the ALJ found that Plaintiff can perform past relevant work as a director, sales attendant, customer service representative, and receptionist. This work does not require the performance of work-related activities precluded by her RFC. (R. at 18–19). The ALJ thus concluded that Plaintiff is not disabled. (R. at 19–20).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

4

support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

In her Statement of Errors, Plaintiff contends that the ALJ violated 20 C.F.R. § 404.1520c during her evaluation of the prior administrative medical findings from the state agency physicians, Jasti Indira, M.D., and Gary Hinzman, M.D. (Doc. 12 at 7–11). Specifically, Plaintiff argues that the ALJ improperly evaluated their opinions for consistency and supportability. (Doc. 12 at 7–11). The Commissioner counters that in crafting Plaintiff's RFC, the ALJ adequately evaluated their opinions under the regulations, and the residual functional capacity was based on the evidence of record. (Doc. 14 at 4–9).

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). A claimant's RFC assessment must be based on all the relevant evidence in her case file. *Id*. *See also* 20 C.F.R. §§ 404.1513(a), 404.1520c (2017).

The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical

5

sources, and (5) prior administrative medical findings.[1] 20 C.F.R. § 404.1513(a)(1)–(5). Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [Plaintiff]'s medical sources." 20 C.F.R. § 404.1520c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." § 404.1520c(c)(1)–(5).

Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered. 20 C.F.R. § 404.1520c(b)(2). When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 404.1520c(c)(1). When evaluating consistency, the more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 404.1520c(c)(2). An ALJ may discuss how she evaluated the other factors but is generally not required to do so. 20 C.F.R. § 404.1520c(b)(2).

---

[1] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§ 404.1513(a)(2), (5).

6

Thus, the role of the ALJ is to articulate how she considered medical opinions and how persuasive she found the medical opinions to be. *Holston v. Saul*, No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021).  The role of the Court is not to reweigh the evidence, but to make sure the ALJ considered the proper factors and supported her conclusion with substantial evidence. *Id.* at *14.

The ALJ found the state agency medical consultants' opinions persuasive with respect to Plaintiff's exertional limitations. (R. at 18). In contrast, the ALJ found other aspects of the opinions, including the visual and environmental limitations, unpersuasive as "inconsistent with the generally normal findings in the treatment record and during the consultative examination." (*Id.*).

When evaluating the opinions of the state agency reviewing physicians, the ALJ determined:

> The State agency (DDS) consultants on initial review and reconsideration found that [Plaintiff] could perform less than the full range of light activity level work, with no climbing of ladders, ropes and scaffolds, and frequent climbing of ramps and stairs. She could also frequently stoop, kneel, crouch and crawl. DDS also found that [Plaintiff] would have to avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, and poor ventilation, as well as avoiding all exposure to hazards. (Exs. 2A, 4A). These opinions are less persuasive because they are inconsistent with the generally normal findings in the treatment record and during the consultative examination. The visual acuity deficits were based on uncorrected vision and did not address corrected visual acuity. Moreover, [Plaintiff] had clear lungs on examination. (Exs. 6F, 10F). The undersigned concurs with the exertional limitation based on her ongoing rheumatoid arthritis and fatigue. DDS was unable to review later records as well, which were generally within normal limits. (Exs. 8F-13F). DDS was also unable to personally treat [Plaintiff]. As a result, the overall DDS findings are unpersuasive, as they are unsupported by the entirety of the record.

(R. at 18).

Plaintiff argues that the ALJ did not consider the supportability of the state agency medical consultants' opinions with respect to Plaintiff's visual acuity deficits. (Doc. 12 at 9). She asserts that, in concluding that the visual acuity deficits were based on uncorrected vision, the ALJ did not "consider the level of support or explanation provided by the state agency experts, and consider how that impacted the overall persuasiveness of their opinions." (*Id.*). As explained below, the Undersigned disagrees.

At the outset, the Undersigned notes the inherent lack of clear delineation between supportability and consistency when an ALJ evaluates the opinion of a reviewer—like a state agency physician—who forms her opinion after a holistic review of the medical evidence of record. Consider, for example, a case in which there has been little or no change to the medical evidence of record between the time the reviewer issues her finding and the ALJ conducts a hearing. In that instance, the evidence upon which the reviewer supported her finding—the complete medical record at the time of her finding—would be virtually identical to the evidence with which the opinion is consistent or inconsistent—the complete medical record at the time of the ALJ's hearing. The ALJ is left in a position in which she is unable to consider supportability without simultaneously addressing consistency, and vice versa. A plaintiff might semantically allege error in such a case—saying that the ALJ only addressed consistency because she compared the reviewer's opinion to the entirety of the record. But the ALJ would have still fulfilled the purpose of the regulation: to give a fulsome review to medical opinions and prior administrative findings, paying particular attention both to how the opinions are internally supported and explained, and how they compare to the record as a whole.

Contrast this with a medical opinion rendered by a treating physician. There, supportability and consistency are more clearly distinguished. The physician supports (or not) her opinion with

her own treatment notes, objective medical findings, and experience with the plaintiff. Her opinion is consistent (or not) with the entire universe of the medical evidence of record.

Other courts in this Circuit have considered this facet of the supportability/consistency framework. In *Vaughn v. Commissioner of Social Security*, the Western District of Tennessee addressed an allegation that an ALJ had not properly assessed the supportability of opinion evidence provided by a physician acting as a "reviewing specialist[ ] . . . ." No. 20-cv-1119-TMP, 2021 U.S. Dist. LEXIS 134907, at *24 (W.D. Tenn. July 20, 2021). The court found that consistency had sufficiently been addressed by the ALJ, because she explicitly detailed why the opinion was inconsistent with other aspects of the record. *Id.* at *25–27. But the ALJ had not meaningfully discussed supportability. *Id.* at *27–32.

Notably, however, the physician based his opinion on other medical records "he reviewed, which completely encompasse[d] the relevant period of discovery." *Id.* at *30–31. In other words, the physician operated in the manner of a state agency reviewer, conducting a holistic review of the medical evidence of record before rendering an opinion. So, the court determined that while the ALJ had not observed 20 C.F.R. § 404.1520c to the letter, she had:

> achieved the regulations' goal of providing notice to [the plaintiff] of why [the physician's] opinion was not persuasive. [The physician]'s opinion was entirely predicated on a review of [the plaintiff]'s medical history and, when recounting that same medical history, the ALJ identified several instances where [the plaintiff]'s medical records did not support a finding of disability. As such, the ALJ's discussion of [the plaintiff]'s medical history is, in essence, a discussion of whether the evidence [the physician] reviewed could actually support his conclusions. Thus, while not being a direct attack on the supportability of [the physician]'s opinion as contemplated by the regulations, the ALJ's opinion is only one step removed from articulating why she believed the basis for [the physician]'s opinion was faulty, i.e. an explanation of the supportability factor.

*Id.* at *34–35. Accordingly, the court concluded that any error in the assessment of the opinion was harmless and remand was not necessary. *Id.* at *36.

This same harmless-error analysis should apply to an ALJ's decision which clearly

9

discusses the consistency of a state agency reviewer's opinion, when that same opinion was formed upon records which encompassed the relevant period of discovery and the ALJ elsewhere discusses those records in detail.

In the present case, the Undersigned finds that the ALJ fulfilled her duty to evaluate the supportability of the medical consultants' findings. The ALJ evaluated supportability where she compared the medical consultants' opinions with the evidence of record related to visual acuity that the medical consultants reviewed. The ALJ found the opinions unsupported as they related to Plaintiff's visual limitations because "[t]he visual acuity deficits were based on uncorrected vision and did not address corrected visual acuity." (R. at 18).

Based on a review of the medical evidence, the medical consultants opined that Plaintiff had three medically determinable impairments, including visual disturbances. (R. at 79, 86). The first reviewing consultant noted that a consultative examination report, discussed in detail below, reflected Plaintiff's "visual acuity without corrective lenses is 20/200 on the right and 20/30 on the left." (R. at 78). The medical consultants did not note any other evidence in the medical record related to vision. (R. at 78–79, 86). Based on this review, the medical consultants classified Plaintiff's visual disturbances as severe. (R. at 78, 86). Later, the medical consultants opined that Plaintiff had visual limitations in her right eye for "near acuity," "far acuity," "depth perception," "accommodation," and "field of vision." (R. at 81, 88). In the field provided to "explain visual limitations and how and why the evidence supports your conclusions," the medical consultants again wrote Plaintiff's "visual acuity without corrective lenses is 20/200 on the right and 20/30 on the left." (*Id.*). The medical consultants repeated this assessment of visual acuity ("VA 20/200 R and 20/30 L") as one piece of evidence, in addition to asthma and transient ischemic attacks, for why Plaintiff's environmental limitations precluded her from all workplace exposure to

10

unprotected heights, heavy machinery, and commercial driving and from concentrated exposure to extreme cold, fumes, odors, dusts, gases, and poor ventilation. (R. at 81, 88–89).

The visual acuity language in the medical consultants' opinions exactly mirrors language from an August 7, 2020 evaluation of Plaintiff by Dr. Swedberg. (R. at 399). The record was available to the medical consultants as part of their review and cited in their findings of fact. (R. at 78, 86). Elsewhere in her opinion, the ALJ highlighted that Dr. Swedberg's assessment of Plaintiff's visual acuity without corrective lenses was 20/200 on the right and 20/30 on the left. (R. at 16) (citing R. at 399). As the ALJ noted, Dr. Swedberg also indicated that Plaintiff could "read large print on the right and small print on the left." (*Id.*). Finally, the doctor noted an impression that Plaintiff had diminished visual acuity in her right eye and had experienced this since she was a teenager. (R. at 401). Dr. Swedberg did not specify if Plaintiff's ability to read large print on the left and small print on the right—or his subsequent impression of Plaintiff's diminished visual acuity—was based on uncorrected or corrected vision. (R. at 399, 401). But he previously made clear that Plaintiff's visual acuity assessment was based on uncorrected vision. (R. at 399). Therefore, it is reasonable to conclude that Dr. Swedberg's impression of diminished visual acuity reflected in this finding was based on Plaintiff's uncorrected vision because he did not say otherwise. Accordingly, the ALJ concluded that Dr. Swedberg's visual acuity deficit finding was "based on uncorrected vision and did not address corrected visual acuity." (R. at 18).

Other than medical records indicating that Plaintiff wore glasses related to vision or eye problems (*see, e.g.*, R. at 311), no other medical records reviewed by the medical consultants touched on any visual limitation or possible condition related to Plaintiff's vision. Even more, Plaintiff did not present other medical evidence reviewed by the medical consultants which explicitly indicated that Plaintiff had visual acuity deficits with corrected vision.

11

Simply put, the ALJ rejected Dr. Swedberg's opinion because it seemed to account only for Plaintiff's uncorrected vision. And the ALJ rejected the medical consultants' opinions regarding visual limitation for the same reason. Indeed, the medical consultants' evidence for the visual limitations explicitly used the phrase "visual acuity without corrective lenses . . . ." (R. at 81, 88). As the ALJ highlights, the medical consultants did not personally evaluate Plaintiff. (R. at 18). Though not dispositive, if they had performed and reported on an evaluation of Plaintiff that tested for visual acuity deficits based on corrected vision, Plaintiff would have more room to argue that the ALJ unreasonably rejected the medical consultants' opinions as unsupported. But as it stands, the medical consultants supported their opinions with only evidence in the available medical record, which was limited to Dr. Swedberg's report. Thus, it was within the ALJ's discretion to discredit the medical consultants' opinions because the underlying records that had been reviewed were based upon uncorrected vision.

And there is more. The ALJ noted that the medical records that post-date the medical consultants' review were "generally within normal limits." (R. at 18). There are notations on medical records that Plaintiff wore glasses as a result of being "blind or [having] serious difficulty seeing" or that she had general "vision or eye problems" in her medical history (*See*, *e.g.*, R. at 464, 593), but there is no mention of a specific visual acuity issue in any record created after the medical consultants formed their opinions. (R. at 18). Likewise, Plaintiff's doctor between July 2019 and April 2021, Dr. Rodel Cacas, did not indicate any vision limitations or visual acuity problems in his Treating Source Statement which he wrote on April 22, 2021, after the medical consultants formed their opinions. (R. at 555). So, the ALJ could reasonably assess the portion of the medical consultants' opinions related to visual limitations as inconsistent with the rest of the medical record of evidence. By highlighting the instances in which the medical consultants'

12

opinions differed from the record as it developed after they formed their opinions, the ALJ properly evaluated the opinions' consistency with the record as a whole.

One final point. Even if the ALJ had not reasonably considered the supportability and consistency of the medical consultants' opinions, it is unclear how a finding that the ALJ erred in her evaluation would change the outcome here. In Plaintiff's Statement of Errors, Plaintiff states that "[t]he ALJ's error is not harmless. The ALJ failed to account for a number of potential visual limitations . . . . Had the ALJ properly evaluated the state agency experts' opinions, the ALJ may have found their opinions to be more persuasive and constructed a much more restrictive [RFC]." (Doc. 12 at 10–11). But it is not clear what vocationally relevant functional limitations the ALJ should have adopted in the RFC determination. Plaintiff does not allege, and it is not clear from the record, particularly how Plaintiff's visual limitations would further restrict her in the workplace that the RFC does not already account for.

During the disability hearing, the ALJ asked the vocational expert if a person could engage in Plaintiff's past relevant work given a series of hypotheticals. The ALJ asked the VE about a hypothetical individual who had precisely Plaintiff's RFC: the capacity to perform light work except the claimant could not climb ladders, ropes, or scaffolds but could engage in frequent climbing of ramps and stairs and frequent stooping, crouching, kneeling, and crawling. (R. at 70–71). The VE assessed that the hypothetical individual could perform all of Plaintiff's past relevant work, except as a dog groomer, as generally performed. (R. at 71). The ALJ further inquired about visual limitations. The VE testified that if the same hypothetical person had vision problems but would still be able to read large print in the right eye and small print in the left, her response would not change. (*Id.*). Here, the ALJ asked about precisely what Dr. Swedberg opined Plaintiff was capable of in his opinion: the ability to read large print on the right and small print on the left.

13

(R. at 399). Plaintiff does not allege that the VE's testimony is erroneous. Nor did Plaintiff's counsel ask the VE any further questions about visual acuity limitations at the hearing. So, even had the ALJ accepted the vocationally relevant terms that Dr. Swedberg's opinion suggested (the ability to read certain type), the ultimate disability determination (whether Plaintiff could perform past relevant work) would have been undisturbed.

For these reasons, it seems the ALJ's RFC determination would not change even if she had found the medical consultant's opinion that Plaintiff's visual acuity deficit was based on corrected vision and was persuaded by their opinions. As such, any error in the ALJ's treatment of the medical consultants' opinions about visual acuity is harmless. *See, e.g., Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) ("When 'remand would be an idle and useless formality,' courts are not required to 'convert judicial review of agency action into a ping-pong game.'") (quoting *Nat'l Labor Relations Bd. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)); *id.* (citing *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result.")).

In sum, it was reasonable for the ALJ to evaluate the visual acuity deficits opined by the medical consultants as unsupported by the evidence they reviewed to form their opinions and inconsistent with the record as a whole. And, even if the ALJ unreasonably evaluated the supportability and consistency of the opinions, the error was harmless.

IV. **CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 12) and **AFFIRM** the Commissioner's decision.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: October 10, 2023            /s/ Kimberly A. Jolson
                                  KIMBERLY A. JOLSON
                                  UNITED STATES MAGISTRATE JUDGE